UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| NANCY POWELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:11-CV-1340 (CEJ) |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On March 14, 2008, plaintiff Nancy Powell filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of February 7, 2007. (Tr. 184-87). After plaintiff's application was denied on initial consideration (Tr. 144-48), she requested a hearing from an Administrative Law Judge (ALJ). See 151-52.

Plaintiff and counsel appeared for a video hearing on January 20, 2010. (Tr. 95-142). The ALJ issued a decision denying plaintiff's application on June 26, 2010 (Tr. 78-93), and the Appeals Council denied plaintiff's request for review on July 15, 2011. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

### II. Evidence Before the ALJ

#### A. Disability Application Documents

In her Disability Report (Tr. 194-202), plaintiff listed her disabling conditions as neurofibromatosis Type 1, high blood pressure, migraines, back problems, brown spots on her brain, and a large mass on her leg. She stated that standing for long periods

of time caused her back pain.  She had severe migraine headaches for which she went to the emergency room to receive pain medication.  She had worked as a factory assembler, home health aide, receptionist, telemarketer, daycare teacher, cashier, and secretary.  She was taking Adipex for weight loss, Midrin for migraines, and unidentified medication for high blood pressure. (Tr. 200).  Topamax[1] and Lortab[2] appeared on an updated medications list.  (Tr. 240).

In her Function Report (Tr. 216-23), plaintiff stated that she took care of her six children, ages two through twelve.  In response to a question regarding her average daily activities, plaintiff wrote that she "give[s] children breakfast, lunch [and] dinner" and does "everything" for them.  She indicated that, due to depression and migraines, her self care had changed but did not specify those changes.  She prepared simple meals that could be completed in less than 30 minutes.  She stated that back and leg pain prevented her from doing most household chores or maintenance tasks.  She went grocery shopping once a month.  She was able to count change, pay bills, and handle a savings or checking account.  She indicated that she had no hobbies, had difficulty reading, and could not sit still long enough to watch a 30-minute television show or two-hour movie.  She had a valid driver's license and drove a short distance to medical appointments once a month.  She indicated that she had difficulty leaving her house, due to depression, headaches, and pain.

B. Hearing on January 20, 2010

---

[1]Topiramate (brand name Topamax) is an anticonvulsant that is used to prevent migraine headache but not to relieve the pain of migraines when they occur. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html.

[2]Lortab is a combination of acetaminophen and hydrocodone bitartrate, a semisynthetic narcotic analgesic, indicated for the relief of moderate to moderately severe pain.  See Phys. Desk Ref. 3314-15 (60th ed. 2006).

-2-

At the time of the hearing, plaintiff was 34 years old.  She lived in a house with her husband and six children, ages 14, 9, 8, 5, 5, and 3.  (Tr. 99).  She left school at age 16 before she completed the 8th grade.  She testified that she had been held back "a couple times" due to poor reading comprehension.  She had been in GED classes for five years and was assessed as performing at a seventh grade level.  Her husband did not work.  She initially stated that this was because he needed to take care of her and the children.  (Tr. 115).  She later acknowledged, however, that he is on disability, as are two of her children.  The family also received housing assistance and food stamps.  (Tr. 116-17).

Plaintiff testified that she was last employed two or three years earlier as an order filler at a factory.  She quit after three days because her leg was swollen and numb and she could not walk.  (Tr. 100-01).  In the fifteen years before she applied for benefits, plaintiff also worked as a receptionist, a home healthcare aide, a telemarketer, a nursing home aide, a hotel housekeeper, and a cashier.  (Tr. 102-04).  Although vague, plaintiff's testimony suggested that she did not maintain any position for more than a few weeks.  See Tr. 132-36.

Plaintiff is 4 feet 11 inches tall and, at the time of the hearing, weighed 185 pounds.  (Tr. 99).  She testified that her weight rose and fell between 185 and 208 pounds.  She suffered migraine headaches with light sensitivity, nausea, vomiting, visual disturbances, and soreness in her head.  Her migraines lasted five or more days during which she lay in bed.  She estimated that she had migraines 19 or 20 days out of 30.  During those times, she did not eat, bathe, or change her clothes.  (Tr. 106).  She took medication but did not believe that it helped.  In addition to headaches, plaintiff testified that she has a tumor the size of a softball on her right leg.  (Tr. 109).

Walking, standing, and driving for more than 20 minutes caused her leg to "give out." (Tr. 111). Most activities -- including bending, stooping, lifting and carrying anything weighing more than five pounds -- caused her to fall. (Tr. 112). The only thing that eased the pain in her leg was to elevate it. Plaintiff also has depression. She testified that she cries two or three times a day, in episodes that last about an hour. Anxiety and worry kept her from sleeping well. (Tr. 107-08).

According to plaintiff's testimony, all household chores were completed by her husband and mother, who lives nearby and spends about half of every day assisting plaintiff and her family. Plaintiff testified that she had no interest in her own personal care and had to be reminded to take care of her grooming. In response to questions from the ALJ, plaintiff stated that she did not engage in childcare activities beyond watching television or napping with the children. (Tr. 123).

Gary Weimholt, a vocational expert, provided testimony regarding plaintiff's past work.[3] (Tr. 134-36). The ALJ ultimately excluded consideration of many of plaintiff's past jobs and focused on her work as a motel housekeeper and telemarketer, both of which the expert testified are classified as light and unskilled. Mr. Weimholt also testified that the housekeeper position has a Specific Vocational Preparation (SVP) level of 2, while the telemarketer position has an SVP of 3.[4] Plaintiff indicated that she

---

[3] The ALJ asked the vocational expert to identify any work plaintiff performed from January 20, 1995 up to the date of the hearing. He responded that he could not tell whether plaintiff's past work satisfied the requirements of substantial gainful activity. (Tr. 133). The ALJ indicated that he would make that determination.

[4] The SVP level listed for each occupation in the Dictionary of Occupational Titiles (DOT) connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. Hulsey v. Astrue, 622 F.3d 917, 923 (8th Cir. 2010). At SVP level 2, an occupation requires more than a short demonstration but not more than one month of vocational preparation; level 3 covers occupations that require over 30 days and up to and including 3 months. 20 C.F.R. §

worked in housekeeping for 3 months and as a telemarketer for 5 weeks. (Tr. 205).

The ALJ asked Mr. Weimholt about the employment opportunities for an individual with plaintiff's education, training and work experience, with the ability to perform light work, who must avoid certain hazards and environmental conditions, including heights, fumes and excessive noise. The vocational expert opined that such an individual would be able to perform plaintiff's past relevant work as a housekeeper and telemarketer. (Tr. 138). He was next asked to assume that the individual was unable to understand, remember, or carry out simple instructions; make simple judgments; respond appropriately to co-workers, supervisors, or usual work situations; or deal with changes in a routine work setting. He opined that an individual with these limitations would be unable to return to plaintiff's past relevant work or perform any other work in the national economy. (Tr. 139-41).

### C. <u>Medical Evidence</u>

In early 2007, plaintiff sought treatment from urgent care centers and emergency rooms for a variety of ailments, including bronchitis, laryngitis and pneumonia. (Tr. 254-59, 281-94). On June 13, 2007, plaintiff saw her primary care physician, Jesse D. Helton, D.O. (Tr. 330). She reported that she had "bad depression," that she was unable to sleep, and cried "all the time." She identified her weight problems, two recent deaths, and illness in her immediate family as precipitating factors in her mood. She did not have suicidal ideation. Plaintiff also had some recent episodes of headache and elevated blood pressure. Dr. Helton noted that plaintiff had not previously received treatment for these conditions. He prescribed a

---

656.3.

trial of Clonidine for treatment of hypertension and anxiety and Prozac for treatment of depression.

On June 18, 2007, plaintiff was treated at St. John's Mercy Emergency Department for a "minimal" displacement of her right wrist and a Colles fracture to the right distal radius. (Tr. 304-19). The examining physician noted that plaintiff had a full range of motion and "appear[ed] very comfortable when not being examined." (Tr. 308). She was provided with a splint and a prescription for Vicodin. She was urged to follow up with an orthopedist. On July 12, 2007, she reportedly sustained further injury to the same wrist and sought treatment at St. Anthony's Urgent Care Center. (Tr. 246-50). She rated the pain at level 7 on a 10-point scale. She reported that she had sustained an "extensive" fracture 5 weeks earlier but could not afford to follow up with an orthopedist. X-rays were negative and plaintiff was discharged with instructions to take Ibuprofen or Tylenol.

On July 30, 2007, plaintiff sought treatment at St. John's Mercy Emergency Department. (Tr. 295-303). She stated that she awoke with a "sharp" headache that was sensitive to light. She also reported nausea. She was observed to have a steady gait. After receiving treatment with Ketorolac,[5] Compazine, and Benadryl, she reported that her pain was almost fully relieved. (Tr. 299).

On August 4, 2007, plaintiff was diagnosed with pneumonia. (Tr. 281-94). On August 22, 2007, she was transported to the emergency room by ambulance with complaints of chest pain. (Tr. 263-80). She described the pain as radiating to her back and rated it at level 9 on a 10-point scale. She had been experiencing the pain

---

[5]Ketorolac tromethamine, or Toradol, is "a nonsteroidal antiinflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]" See Dorland's Illustrated Med. Dict. 1966, 998 (31st ed. 2007).

-6-

sporadically for three weeks. Plaintiff reported that in the past she had been told that these symptoms might be due to her gallbladder. (Tr. 273). She was oriented and breathing with ease and her skin was warm and dry. (Tr. 265). An ultrasound of the abdomen revealed a normal liver, gallbladder, and pancreas, mild splenomegaly, and echogenic portions of the kidney raising a question of medullary sponge kidney. (Tr. 263). An EKG was normal. (Tr. 268). She was treated with Toradol and morphine and discharged.

Plaintiff saw Dr. Helton for follow up on August 28, 2007. She complained of epigastric pain that radiated to her back and caused nausea. (Tr. 329). She reported that the emergency room physician told her that her gallbladder was the source of her problem but, as Dr. Helton noted, her ultrasound was normal. She was started on a trial of Nexium.

Plaintiff returned to Dr. Helton's office on November 9, 2007. (Tr. 328). She reported that she continued to experience periodic epigastric pain that lasted a few days when present. The Nexium did not help. On examination, Dr. Helton noted the presence of a soft-ball sized neurofibroma on her right lateral leg. Plaintiff weighed 197 pounds and she complained that she had been unable to lose weight despite various diet plans and over-the-counter preparations. She stated that she walked two or three laps around a track every day. Plaintiff was started on Adipex for weight loss.

On December 7, 2007, plaintiff complained of a cough and headache. (Tr. 326). One child had strep throat and another had pneumonia. She had lost 15 pounds and otherwise appeared well. Dr. Helton prescribed medications for congestion and refilled plaintiff's prescription for Adipex. On January 4, 2008, plaintiff reported that she had had constant pain in her right shoulder for two weeks that was made worse by using

a computer mouse. (Tr. 326). Her chiropractor told her it was a rotator cuff tear. On examination, Dr. Helton noted marked weakness and tenderness on palpation. He referred plaintiff for an MRI and told her to take Ibuprofen for pain.

Plaintiff returned on February 6, 2008. (Tr. 325). She continued to complain of shoulder pain. In addition, she had a headache, sore throat, and a slight injury to her left hand. On examination of the hand, Dr. Helton observed mild bruising and tenderness on palpation, but no fracture or neurovascular deficit. He splinted her fingers and prescribed antibiotics for an upper respiratory infection. Overall, plaintiff appeared well and was not in apparent distress. On March 11, 1008, plaintiff requested medication for headaches. She reported that her mother took Topamax and she wanted to try it. (Tr. 324). Dr. Helton diagnosed plaintiff with headache (cephalgia) and essential hypertension and prescribed a trial of Inderal to treat both conditions. On April 8, 2008, plaintiff reported that she was not taking the Inderal every day as prescribed and again requested a prescription for Topomax. (Tr. 323). Dr. Helton noted that plaintiff needed a sleep study for hypersomnia but that she wanted to wait until she had health insurance. The diagnoses on that day included migraine cephalgia, malaise, hypersomnia, and essential hypertension. Plaintiff was given a trial of Topomax for headaches and was advised to take her Inderal daily to regulate her blood pressure. On May 6, 2008, plaintiff reported to Dr. Helton that she was doing well with her current medications. (Tr. 334). He described her as appearing well and in no apparent distress. He also noted the presence of neurofibromas on her face and extremities.

On May 12, 2008, Marsha Toll, Psy.D., completed a Psychiatric Review Technique. (Tr. 335-45). Dr. Toll concluded that plaintiff had a medically determinable

diagnosis of depression but that her condition was not severe.  Plaintiff had mild difficulties in maintaining social functioning and concentration, persistence or pace.  In a narrative section, Dr. Toll noted that plaintiff did not allege disability due to a mental condition.  The only complaint of depression in the medical record occurred in June 2007, when plaintiff reported that there had been two deaths in the family.  Plaintiff's daily activities included caring for six children.  She indicated that she had experienced changes in her self care and that she found it difficult to leave home due to feeling depressed.  These claims were considered partially credible but, based on the totality of the evidence, plaintiff's impairment was not severe.

A nonexamining consultant[6] completed a Physical Residual Functioning Capacity Assessment (PRFCA) on May 12, 2008.  (Tr. 346-51).  Based on a review of the medical records, the consultant determined that plaintiff can occasionally lift or carry 20 pounds and frequently carry 10 pounds.  She can sit, stand, or walk about 6 hours in an 8 hour day, and had no limitations in pushing or pulling.  The examiner noted that plaintiff claimed disability due to neurofibromatosis, high blood pressure, migraines, back problems, brown spots on the brain and a mass on her left leg.  The medical record included diagnoses for neurofibromatosis and morbid obesity.  With respect to plaintiff's migraine headaches, the examiner noted that her symptoms did not rise to "listing level," but plaintiff should nonetheless avoid exposure to environmental hazards and noise during migraines.  Plaintiff was also treated for high

---

[6]The form indicates that the PRFCA was completed by a Single Decision Maker (SDM).  Missouri is one of ten test states participating in a prototype test of the SDM model, in which "Disability Examiners with SDM authority complete all disability determination forms and make initial disability determinations in many cases without medical or psychological consultant (MC or PC) signoff." https://secure.ssa.gov/poms. nsf/lnx/0412015100 (last visited on July 18, 2012).

blood pressure, which had not resulted in end organ failure, but which necessitated a restriction on working on heights.  The medical record did not include ongoing complaints of, or treatment for, back pain.  Plaintiff's daily activities included caring for six children.  She had difficulty with chores and shopping and was unable to watch a 2-hour movie[7] because she could not stand or sit for a long period of time.  These allegations were considered partially credible and would not preclude her from performing within the specified limitations.

Plaintiff returned to the emergency room on June 8, 2008, for treatment of a headache that had lasted three days.  (Tr. 353-71).  She reported that she had dizziness and pain at the base of her skull and dizziness.  She complained of nausea and was unable to catch her breath.  She also reported seeing spots and having episodes of confusion during which she blacked out and became nonresponsive.  A physical examination did not disclose any weakness, fever, or neurological deficits.  A CT scan of her head was normal.  (Tr. 369).  Plaintiff was diagnosed with headache and vertigo and discharged with prescriptions for Meclizine and Darvocet.

Plaintiff was seen at the emergency room on September 17, 2008, with increased swelling in her right lower leg that started the previous day.  (Tr. 372-87).  On examination, there was pain on palpation and with walking, but no redness or warmth.  She rated the pain at level 9 on a 10-point scale.  She also had pain in her left ear.  She was diagnosed with cellulitis and discharged with a prescription for Keflex and Percocet.

---

[7]As noted above, plaintiff also stated that she could not watch a 30-minute television show.  This allegation is not addressed in the PRFCA.

On October 16, 2008, Stanley London, M.D., completed a consultative orthopedic evaluation of plaintiff.  (Tr. 388-94).  His report indicates that he did not review any records.  Plaintiff's chief complaints involved pain in her right leg and back.  She reported that she bumped her lower right leg 14 years earlier.  She had a swelling that occasionally became black and blue.  She was told that the swelling may be torn muscles or ligaments.  She also reported back pain with "questionable radiation to her right leg" with numbness and tingling, that had been occurring since she had a fall 15 years earlier.  She described the pain as sharp and stated that the pain in her leg was constant while the back pain came and went.  She reported that she could walk for a block, and stand or sit for 20 minutes.  She did not use a cane or crutch.  On examination, Dr. London noted that plaintiff did not have true radiation of pain.  He described a soft mass on plaintiff's lower right leg that was about 14 cm. across.  She walked slowly and favored her right leg.  She had trouble heel walking and squatting and was able to toe walk "a little."  She got on and off the examining table with difficulty.  She had some hypesthesia in the right lower leg compared to the left leg; reflexes at her knees and ankles were hypoactive.  Straight-leg raising was positive, with pain produced at 30 degrees, and her range of motion was limited.  On a 5-point scale of muscle strength, with 5 indicating normal strength, plaintiff's lower right leg was rated at 4.  (Tr. 392).  However, she made only fair effort.  Dr. London's clinical impressions were possible degenerative joint disease or disc disease and right leg post-trauma swelling and weakness with possible effusion or muscle tearing.  Dr. London opined that plaintiff had a disability expected to last for 3 to 5 months.  (Tr. 394).

Plaintiff was treated for laryngitis and strep throat in January 2009 (Tr. 402-07), and for pain in her clavicle in March 2009.  (Tr. 408-12).  In April 2009, she was

diagnosed with bronchitis.  (Tr. 413-16).  In September 2009, she sought treatment for chronic pain in her left knee which had recently worsened.  (Tr. 418-21).  She had decreased range of motion and tenderness, without redness or swelling.  X-rays were normal.  Two days later she required treatment for a punctured ear drum.  (Tr. 423).

### III.  The ALJ's Decision

In the decision issued on June 26, 2010, the ALJ made the following findings:

1. Plaintiff has not engaged in substantial gainful activity since March 10, 2008, the application date.[8]

2. Plaintiff has the following severe impairments: migraine headaches, hypertension, neurofibromatosis, and morbid obesity.

3. Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. Plaintiff has the residual functional capacity (RFC) to perform a limited range of light work: she can occasionally lift and/or carry (including upward pulling) 20 pounds and frequently lift and/or carry (including upward pulling) 10 pounds.  She can stand and/or walk for 6 hours in an 8-hour day and can sit for 6 hours in an 8-hour day.  She has nonexertional limitations in that she must avoid concentrated exposure to noise, fumes, odors, dust, gases, poor ventilation; and hazards such as dangerous moving machinery, unprotected heights, and open flames or heat.

5. Plaintiff is able to perform her past relevant work as a housekeeper and telemarketer.  This work does not require performance of work-related activities precluded by her residual functional capacity.

6. Plaintiff has not been under a disability, as defined in the Social Security Act, from March 10, 2008, through the date of the decision.

(Tr. 81-90).

### IV.  Legal Standards

---

[8] The application is dated March 14, 2008.

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942.

If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d

785, 792 (8th Cir. 2005)).  After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.  Discussion

Plaintiff contends that the ALJ erred in determining her RFC and the hypothetical posed to the vocational expert did not reflect plaintiff's impairments.

Based on his review of the medical evidence and assessment of plaintiff's credibility, the ALJ determined that plaintiff has the RFC to perform a limited range of light work in that she can occasionally lift and/or carry 20 pounds and frequently lift

and/or carry 10 pounds.  She can stand and/or walk for 6 hours in an 8-hour day and can sit for 6 hours in an 8-hour day.

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted).  "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."  Id. (citation omitted).  "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant."  Id.  Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).  "The need for medical evidence . . . does not require the [Commissioner] to produce additional evidence not already within the record." Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).  The ALJ "is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision."  Id. (quotation and citation omitted).

Although plaintiff does not challenge the ALJ's credibility determination, a brief summary is useful.  The ALJ discounted plaintiff's allegations of disabling headaches, noting that she received "essentially routine and conservative" care provided by her family practitioner, with no assessment from a specialist and only infrequent emergency treatment.  As for her complaints of back and leg pain, the ALJ noted that there was no evidence of nerve root compression or radiculopathies.  Although plaintiff favored her right leg, she walked without assistive devices.  Plaintiff had long periods

of time following her alleged date of onset during which she took no pain medication. The ALJ also discredited plaintiff's account of her daily activities as inconsistent with her Function Report. The Court finds no error in the ALJ's credibility assessment.

Plaintiff argues that the ALJ improperly based his RFC determination on the PRFCA completed by an agency nonmedical examiner. In reaching his RFC determination, the ALJ stated that he:

> consider[ed] the opinions of the State agency medical consultants who evaluated the evidence of record at the initial and reconsideration levels of the administrative review process and assessed that the claimant retained the capacity to perform light work with environmental limitations. (Exhibit B-6F). The [ALJ] gives the opinions of the State agency medical consultants great weight because they are well supported by medically acceptable clinical and laboratory findings, and are consistent with the record when viewed in its entirety.

(Tr. 89).[9]

An ALJ may rely upon the opinion of a nontreating or consultative "medical source," but he may not give the same weight to the opinion of a nonmedical, or lay, state agency evaluator. Williams v. Astrue, 4:11CV00057 AGF, 2012 WL 946806, at *9 (E.D. Mo. Mar. 20, 2012). Reliance on the opinion of nonmedical state evaluator will not, without more, provide substantial evidence in support of an RFC. See, e.g., Dewey v. Astrue, 509 F.3d 447, 449–50 (8th Cir. 2007). Social Security Ruling (SSR) 96-6p, 1996 WL 374180 (July 2, 1996), which the ALJ cited, addresses the weight to be accorded to agency medical sources. The citation supports an inference that the ALJ weighed the opinion of a layperson under the rules appropriate for weighing a medical opinion, which constitutes legal error. Id. at 449.

---

[9]Defendant argues that the ALJ was "most likely" referring to the opinion of agency medical consultant Marsha Toll, Psy.D., who is an acceptable medical source. However, the exhibit cited by the ALJ is the PFRCA completed by an agency nonmedical source.

Defendant argues that the error is harmless because the PRFCA is consistent with the medical record.  The only medical assessment of plaintiff's limitations are found in the report of the consultative examiner, Dr. London.[10]  He noted that plaintiff had limited flexion and extension of her back and demonstrated positive straight leg raising bilaterally.  She favored her right leg when she walked and had some hypesthesia and reduced strength in that leg compared to her left.  In addition, Dr. London observed that plaintiff got on and off the examining table "with difficulty" (Tr. 389), a sentence the ALJ misread.  See Tr. 87 ("She could get on and off the examination table _without_ difficulty." (emphasis added).  These observations, which were made after the completion of the PRFCA, are relevant to the RFC determination that plaintiff retained the capacity to meet the requirements for light work.  Furthermore, these observations are entitled to the greater weight accorded to a medical opinion.

In reaching his RFC determination, the ALJ gave improper weight to the opinion of a nonmedical source and misread the report of the consultative examiner.  The Court cannot say that these were harmless errors and thus the matter must be remanded for further assessment of plaintiff's RFC.  In the event that it is determined that plaintiff does not retain the RFC to return to her past relevant work, it will be necessary to obtain testimony from a vocational expert based on a properly formulated hypothetical.

---

[10]Dr. London opined that plaintiff's low back pain could possibly be due to degenerative joint or disc disease, while the pain in her right leg could be due to effusion or fascial muscle tearing.  The Court notes that Dr. London did not have access to plaintiff's medical records and there is no indication that he was informed that she has neurofibromatosis, which undermines the utility of these diagnoses.

-18-

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 6th day of August, 2012.